[Nos. A114918, A116182. First Dist., Div. One. Oct. 31, 2008.]

SHOPOFF & CAVALLO LLP et al., Plaintiffs, Cross-defendants and Respondents, v.
JUNHO HYON, Defendant, Cross-complainant and Appellant;
LAURENCE COLANGELO et al., Defendants and Respondents;
ERIC SELTEN, Defendant, Cross-defendant and Respondent.

## COUNSEL

Sheppard Mullin Richter & Hampton, Robert J. Stumpf, Jr., and Craig A. Pinedo for Defendant, Cross-complainant and Appellant.

Hinshaw & Culbertson, Ronald E. Mallen, Paul E. Vallone and David L. Winnett for Plaintiffs, Cross-defendants and Respondents.

Nunziato Buckley Weber, Tom A. Nunziato, Illece Buckley-Weber; and Alfred B. Stedman for Defendant, Cross-defendant and Respondent and for Defendant and Respondent Laurence Colangelo.

Law Offices of Jeffrey D. Kirk and Jeffrey D. Kirk for Defendants and Respondents Jeffrey D. Kirk, Pine & Pine and Norman Pine.

Ervin, Cohen & Jessup and Heather L. McCloskey for Defendant and Respondent Ervin, Cohen & Jessup.

## OPINION

**SWAGER, J.**—These consolidated appeals have been taken by Junho Hyon from a judgment in an interpleader action that awarded respondents percentage shares in the proceeds derived from a global settlement of former litigation. The awards were based upon respondents' contingent fee agreements with Hyon and Laurence Colangelo. The court subsequently awarded respondents as prevailing parties attorney fees based on provisions in the same agreements.[1] In a wide-ranging attack on the judgment, Hyon claims that respondent Shopoff's demurrers to his amended cross-complaint were erroneously sustained, he was improperly denied a jury trial, the judgment in favor of respondents is barred by principles of collateral estoppel, the retainer agreements are unenforceable under Business and Professions Code section 6155 and rule 3-300 of the Rules of Professional Conduct, and the awards of attorney fees to respondents are based on unenforceable agreements.

We conclude that respondent Shopoff's demurrers were properly sustained, appellant Hyon had no right to a jury trial in the interpleader action, and only the judgment and award of attorney fees in favor of respondent Eric Selten were based on an illegal, unenforceable contract. In all other respects we affirm the judgment and awards of attorney fees.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY[2]

We have before us another appeal in this contentious and long-running dispute between parties claiming various interests in the assets (hereafter the Recovery) obtained from litigation known as the "Decker Island litigation." This litigation had been initiated by appellant Junho Hyon and respondent Laurence Colangelo as coplaintiffs in 1993. By January of 1997, Hyon and Colangelo began to search for a replacement attorney to continue the

---

[1] The court also awarded fees to Shopoff for his work as trustee and fees for the interpleader action pursuant to Code of Civil Procedure section 386.6.

[2] Some of our recitation of the underlying facts in the case will be taken directly from our prior unpublished opinion (*Shopoff & Cavallo LLP v. Hyon* (June 15, 2006, A111396) [nonpub. opn.] (A111396)), and the more recent published opinion (*Selten v. Hyon* (2007) 152 Cal.App.4th 463 [60 Cal.Rptr.3d 896]).

prosecution of the Decker Island litigation. To assist in that endeavor they entered into a contract (the 1997 Agreement) with National Legal Network (NLN). Respondent Eric Selten, who is not an attorney, was then president of NLN. The 1997 Agreement called for NLN to act as Hyon and Colangelo's "agent, consultant, and case manager with regard to" the Decker Island litigation. NLN was authorized to retain counsel for Hyon and Colangelo and to provide other litigation support services, which included facilitating communication among Hyon, Colangelo, and counsel. The contract further provided that NLN was to receive a contingent fee of 10 percent of any recovery in the Decker Island litigation upon successfully retaining new counsel for Hyon and Colangelo, and performing the other services specified in the contract. If "NLN [was] unsuccessful in arranging" for new counsel to represent Hyon and Colangelo in the litigation, then NLN would "not be entitled to compensation under this Agreement." The 1997 Agreement also specifically provided that Selten shall not be expected to perform any legal services for Hyon and Colangelo. "In 1999, NLN assigned 'all rights, title and interest' and 'all the remaining and executory obligations' under the contract to Selten," and the parties agreed to increase his contingent fee from 10 to 12 percent. (*Selten v. Hyon, supra,* 152 Cal.App.4th 463, 465 (*Hyon*).)

Selten successfully recruited respondent Eliot Disner of the law firm of Ervin, Cohen & Jessup to represent Hyon and Colangelo in the Decker Island litigation. Disner's firm in turn hired respondent Jeffrey Kirk as local counsel to assist with the case, primarily by pursuing and preventing fraudulent conveyances by the defendants in the Decker Island litigation that would dissipate recoverable assets. (*Hyon, supra,* 152 Cal.App.4th 463, 465.)

In November of 1998, a jury returned a $42 million verdict in favor of Hyon and Colangelo, but the trial court granted a defense motion for judgment notwithstanding the verdict, leading to an appeal. To pursue the appeal, Hyon and Colangelo retained new appellate counsel, Elliot Bien, upon Disner's recommendation. The appeal was successful resulting in a reversal of the judgment notwithstanding the verdict, and a remand for a retrial of the action.[3] Disner, who had been working on a contingency basis, declined to handle the retrial, so Hyon and Colangelo were compelled to retain new trial counsel on a "pure contingency" basis. By March of 2002, Hyon and Colangelo retained respondent Jeffrey Shopoff of the law firm of Jeffer, Mangels, Butler & Marmaro. According to Shopoff's agreement with Hyon and Colangelo, he was to receive a contingent fee of 21 percent of the Recovery, along with a lien on the Recovery. Shopoff later left the Jeffer, Mangels law firm, but continued to represent Hyon and Colangelo in the Decker Island litigation through retrial of the case, which resulted in a $7.6 million verdict for Hyon and Colangelo.

---

[3] *Colangelo v. Mega Sand, Inc.* (Apr. 28, 2000, A086441) (nonpub. opn.).

Shortly thereafter, faced with obstacles to enforcing the $7.6 million judgment Shopoff negotiated a Global Settlement Agreement (GSA) on behalf of Hyon and Colangelo that finally resolved the Decker Island litigation. Pursuant to the terms of the GSA, the assets which constituted the Recovery were transferred to Hyon and Colangelo. Those assets consisted of "all of the common stock of two corporations, Mega Sand Incorporated and Taiki Corporation, which in turn own[ed] a sand mining operation with related use permits, along with real property called Decker Island which was encumbered by a deed of trust; equipment for the mining operation and other tangible and intangible property; real property and partnerships in Oregon; and cash. With the assets of Mega Sand Incorporated and Taiki Corporation, [Hyon] and Colangelo intended to operate the sand mining business to protect and enhance their interests in the Recovery. The GSA expressly granted them 'sole and exclusive discretion to sell or operate Decker Island and the sand business.' The GSA also required [Hyon] and Colangelo to pay the defendants in the Decker Island litigation a total of $2.6 million, in annual payments of $450,000, beginning in October of 2005." (*Shopoff & Cavallo LLP v. Hyon, supra,* A111396.)

In addition to the 21 percent and 12 percent shares in the Recovery claimed by Shopoff and Selten, respectively, "other attorneys who performed legal services for [Hyon] and Colangelo during the course of the lengthy and protracted Decker Island litigation also claimed percentage shares of the Recovery and associated lien interests pursuant to separate contingent fee agreements: Elliot Bien, 6 percent; Norman Pine and the law firm of Pine & Pine (Pine), 6.5 percent; the law firm of Ervin, Cohen & Jessup, 10 percent; and Jeffrey Kirk, 5 percent.[4]" (*Shopoff & Cavallo LLP v. Hyon, supra,* A111396.) Hyon and Colangelo "realized that the total of the contingent fees owed to all of the attorneys and Selten could amount to between 48.5 percent and 60.5 percent of the Recovery." (*Ibid.*)

By the time the GSA was executed, however, Hyon and Colangelo were already embroiled "in a dispute over their own relative ownership interests in the Recovery. Colangelo believed he was entitled to one-half of the proceeds of the Recovery, less any contingent fee claims and amounts previously contributed by [Hyon] to finance the litigation. [Hyon] claimed that he was entitled to a larger percentage share of the proceeds due to his commensurately greater efforts and financial contributions to the pursuit of the Recovery." (*Shopoff & Cavallo LLP v. Hyon, supra,* A111396.) According to the terms of a preexisting agreement between Hyon and Colangelo, the "disputed amount" of the Recovery had been placed in the "Col-On Trust." Shopoff was

---

[4] Bien settled his claim and is no longer a party to this action. "The 10 percent contingent fee claimed by Ervin, Cohen & Jessup was disputed by appellant and Colangelo." (*Shopoff & Cavallo LLP v. Hyon, supra,* A111396.)

subsequently appointed trustee of the Col-On Trust until Hyon and Colangelo resolved their "differences" and finally distributed the proceeds of the GSA. "Pursuant to the terms of the Col-On Trust, Shopoff, acting in the capacity of trustee, . . . took 'legal possession' of the assets of the Recovery, including cash, stock certificates, and assignment of deeds of trust." (*Ibid.*)

Hyon and Colangelo "continued to negotiate their [respective] rights to the Recovery proceeds. On December 19, 2003, they executed an agreement that contemplated their joint operation of the 'Decker Island Business' and delineated their respective shares in the business assets. A successor and superseding agreement dated May 25, 2004 (the 2004 Settlement Agreement), 'resolve[d] the differences of the parties' and confirmed their interests in the Recovery and the Decker Island Business: 22.31 percent to [Hyon], and 11.59 percent to Colangelo.[5] They expressed an intent to transfer the assets of the Recovery to 'a new entity' formed and managed by the parties in accordance with 'their respective percentage interests' stated in the 2004 [Settlement] Agreement. [Hyon] and Colangelo further agreed to use their 'best efforts to cooperate in the operation of the business of Decker Island' and resolution of their remaining claims and disputes. The 2004 Settlement Agreement also specified that the contents of the Col-On Trust 'shall be distributed in accordance with the written direction of the parties to the trustee.' " (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.)

"Colangelo sought to implement a partnership with Hyon which also included Selten as an active partner in the future operation of the Decker Island Business. Selten agreed to relinquish his 12 percent interest in the Recovery in exchange for a corresponding interest in the partnership. [Hyon], Colangelo and Selten thus embarked upon a new 'three-way partnership,' referred to as 'Decker Sand Co., LLC,' or 'Newco,' with their percentage interests in the partnership set at 48.60 percent, 25.25 percent, and 26.15 percent, respectively.[6] They advised Shopoff that the three of them were members of the partnership, with an office at Selten's address, and were entitled to make 'all business decisions' related to the sand mining operation. Until July of 2004, [Hyon], Colangelo and Selten functioned as partners to conduct the Decker Island Business, with decisions made upon agreement of 'at least two of the three partners.' " (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.)

Nevertheless, the relationships between the parties continued to deteriorate. Hyon subsequently disavowed that Selten held any valid enforceable interest

---

[5] "That represented respective interests in the Decker Island Business of 65.82 percent to appellant and 34.18 percent to Colangelo." (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.)

[6] "That represented shares in the Recovery of 22.31 percent for Hyon, 12 percent for Selten and 11.59 percent for Colangelo." (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.)

in the Decker Island business or partnership,[7] and "repudiated the existence of any three-way partnership with Colangelo and Selten. He requested that Colangelo transfer control of the Decker Island business venture entirely to him. He also demanded that Shopoff transfer the corporate stock to him. Colangelo, in turn, advised Shopoff not to 'turn over the stock' to appellant, repudiated their 2004 Settlement Agreement, and terminated their partnership relationship." (*Shopoff & Cavallo LLP v. Hyon, supra,* A111396.)

"On September 9, 2004, Shopoff filed a complaint in interpleader [in the Superior Court of the City and County of San Francisco] to resolve 'multiple, conflicting claims with respect to the interests' of the named defendants— which included [Hyon], Colangelo, Selten, and the attorney claimants or their assignees—in the Recovery. The complaint alleged that as a result of an unyielding dispute among the claimants, the trustee of the Recovery was given no direction or instructions, and was subjected to 'multiple and conflicting claims' and demands 'with respect to the Recovery.' Shopoff further alleged that the Recovery was in 'imminent danger of loss' due to the impasse of the conflicting claimants and 'array of conflicting demands.' The complaint requested a determination of the validity and value of the share of each claimant in the proceeds of the Recovery, an order delineating the respective rights and duties of the parties, appointment of a receiver to take possession and control of the Recovery, and a discharge of the trustee from all liability to the defendants." (*Shopoff & Cavallo LLP v. Hyon, supra,* A111396.)

"The defendants submitted answers to [Shopoff's] interpleader complaint in which their various claims to the Recovery were asserted, and numerous cross-actions and related pleadings were filed. First, on September 16, 2004, [Hyon filed a complaint, followed by a second amended complaint,] in Los Angeles County Superior Court (the LA Action) against Colangelo and Selten, among others, for breach of contract, breach of fiduciary duties, fraud, and injunctive and declaratory relief. [Hyon's] LA Action essentially sought to enforce the provisions of the 2004 Agreement with Colangelo, to obtain a judicial determination that the three-way partnership with Colangelo and Selten [was] invalid and unenforceable, and to distribute the proceeds of the Recovery." (*Shopoff & Cavallo LLP v. Hyon, supra,* A111396.)

"Selten cross-complained against Hyon, Colangelo, and others [in the LA Action. Selten's] first amended cross-complaint alleged claims for breach of

---

[7] "He asserted that the underlying 'NLN contract' was 'void and unenforceable' because Selten was engaged in the 'unauthorized practice of law' and unlawful lawyer referral services during the Decker Island litigation, and committed fraud, breach of fiduciary duties, and undue influence associated with the purported partnership agreement. [Hyon] denied that Selten had 'any right to or interest in the Recovery.' " (*Shopoff & Cavallo LLP v. Hyon, supra,* A111396.)

partnership agreement, breach of fiduciary duty, and fraud, as well as common counts for the agreed price or, alternatively, the reasonable value of work, labor, and services [he] rendered." (*Hyon, supra*, 152 Cal.App.4th 463, 466.)

"On December 23, 2004, Colangelo filed a cross-complaint against [Hyon] and Selten in the interpleader action for dissolution of partnership and an accounting, rescission, breach of fiduciary duty, and intentional interference with contract. Colangelo requested appointment of a receiver and liquidation of the partnership assets. Pursuant to a change of venue motion by [Hyon], the court ordered a transfer of Colangelo's cross-complaint to Los Angeles County.[8] Colangelo and Selten then filed cross-complaints against [Hyon] in the LA Action which included causes of action for dissolution of partnership, rescission, fraud, breach of fiduciary duty, and breach of partnership agreement. They requested a dissolution of the partnerships, appointment of a receiver, and a determination of the respective rights of the parties to the Recovery and the Decker Island Business partnership." (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.)

Hyon filed a cross-complaint against Shopoff in the interpleader action on January 5, 2005, which alleged that Shopoff committed legal malpractice, conversion, breach of fiduciary duties, misappropriation of assets, and constructive fraud. After Shopoff's demurrers were ultimately sustained to Hyon's first and second amended cross-complaints, "Shopoff remitted the sum of $650.60 in the interpleader action to satisfy" Hyon's "claims of his misconduct." (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.)

"On April 27, 2005, Colangelo and Selten filed a motion in the interpleader action for appointment of a receiver to take possession of the Recovery proceeds. The motion was joined by Shopoff, Kirk and Bien. [Hyon] was the only party to the interpleader action who actively opposed the motion." (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.)

The interpleader action and the Los Angeles County Superior Court action (LA Action) proceeded along separate but intermittently intertwined paths. Hyon moved for summary judgment on Selten's first amended cross-complaint in the LA Action on grounds that all of Selten's claims were based on the illegal and unenforceable 1997 contract, which called for Selten to engage in the unauthorized practice of law and to provide unlawful attorney referral services (Bus. & Prof. Code, § 6155).[9] (*Hyon, supra*, 152 Cal.App.4th 463, 466.)

---

[8] "The transfer of the cross-complaint never occurred, and the action was subsequently dismissed without prejudice." (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.)

[9] All further statutory references are to the Business and Professions Code unless otherwise indicated; all references to rules are to the Rules of Professional Conduct.

"In opposition to the motion, Selten argued that the contract did not call for, and he did not in fact engage in, the unauthorized practice of law." (*Hyon, supra*, 152 Cal.App.4th 463, 466.) Selten did not dispute that neither he nor NLN was registered with the State Bar as an attorney referral service as required by section 6155, but introduced declarations from Attorneys Disner, Kirk, Bien, and Shopoff, among others, in which they stated that they never witnessed Selten engage in the unauthorized practice of law, and that all legal work was performed by them or under their supervision or control, without Selten's interference or participation. Selten separately asserted that his business, NLN, did not constitute an attorney referral service within the meaning of section 6155. Selten also recited in his declaration that he worked approximately 8,000 hours for Hyon and Colangelo pursuant to the 1997 Agreement until the Decker Island litigation was settled in 2003. (*Hyon, supra*, at p. 467.)

The trial court in the LA Action granted Hyon's summary judgment motion on the ground that Selten provided unlawful attorney referral services to Hyon and Colangelo pursuant to his 1997 Agreement with them. The court further found that the unlawful provisions of the contract could not be severed, and was therefore unenforceable in its entirety. All of Selten's claims required proof of the unlawful contract and the consideration purportedly due under it, so the court determined that Hyon was entitled to judgment in his favor on Selten's first amended cross-complaint. The court did not reach the issue of the unauthorized practice of law.[10] (*Hyon, supra*, 152 Cal.App.4th 463, 467.)

Then, "[a]fter a hearing in the interpleader action on the motion to appoint a receiver on June 13, 2005, the trial court found that the inability of [Hyon], Colangelo and Selten to agree on important issues related to the operation of the Decker Island Business placed 'the Recovery in serious risk of loss and material injury, and a receiver is required to preserve the property and the rights of the interested parties, which parties include not only Hyon and Colangelo, but probably the other parties in this action.' The court granted the receiver 'full powers to manage the Recovery to preserve and maximize its value, including encumbering the Recovery in order to preserve it, such as obtaining a loan secured by the assets.' " (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.) An appeal to this court followed.

While the appeal was pending, Hyon's legal claims in the LA Action were tried to a jury; the remaining equitable issues were briefed and argued to the court. A judgment was entered on November 14, 2005, which resolved all causes of action as to all parties. Hyon recovered nothing on his complaint

---

[10] "Selten filed a motion for new trial, challenging the summary judgment ruling. The trial court denied the motion." (*Hyon, supra*, 152 Cal.App.4th 463, 467.)

against Selten and Colangelo. (*Hyon, supra*, 152 Cal.App.4th 463, 467.) The court ruled that Hyon " 'established no legal liability against Colangelo and Selten' on his causes of action for breach of contract, fraud, concealment, breach of fiduciary duty, constructive fraud, and negligence. No three-way partnership agreement with Selten was found, but the 2004 Settlement Agreement between [Hyon] and Colangelo was found 'not rescinded,' and pursuant to it their ownership interests in the Decker Island Business were distributed[:] 65.82 percent to [Hyon] and 34.18 percent to Colangelo," with their commensurate "shares of the Recovery under the GSA" calculated as "22.31 percent to [Hyon] and 11.59 percent to Colangelo. The judgment in the LA Action expressly did not dissolve the partnership of [Hyon] and Colangelo—although the [partnership] relationship was declared 'ripe for dissolution'—and directed that all remaining disputes between the parties were to be resolved in the 'San Francisco interpleader action.' " (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.) Selten filed a timely appeal from the judgment, challenging only the ruling on Hyon's motion for summary judgment on the first amended cross-complaint. (*Hyon, supra*, at p. 467.) The remainder of the judgment became final on January 14, 2006.

Then, while Selten's appeal of the summary judgment in favor of Hyon was pending, in an opinion[11] filed on June 15, 2006, we affirmed the trial court's appointment of a receiver in the interpleader action with " 'full powers to manage the Recovery to preserve and maximize its value.' " (*Shopoff & Cavallo LLP v. Hyon, supra*, A111396.) The interpleader action returned to the trial court for resolution of the competing claims of the parties to their percentage shares of the Recovery.

The appeal in the LA Action was still pending when the trial court issued its statement of decision in the case now before us on May 24, 2006. The court considered and determined the various individual claims to the Recovery based on the contingent fee agreements of Shopoff, Selten, Kirk, Pine and the law firm of Ervin, Cohen & Jessup with Hyon and Colangelo. To resolve the validity and extent of the individual claims to shares of the Recovery, the court confronted Hyon's claims of unclean hands, unconscionability, violations of the Rules of Professional Conduct of the State Bar of California, primarily rule 3-300, judicial estoppel, Selten's unauthorized practice of law without a license and operation of an illegal lawyer referral service, and ethical considerations. The court found that the retainer agreements did not violate rule 3-300, Selten did not operate an illegal referral service or engage in the unauthorized practice of law, and respondents' shares were not subject to diminution under equitable principles. Other than reducing the percentage share awarded to the law firm of Ervin, Cohen & Jessup from 10 percent—which the court found was an "unfairly high" percentage—to 3 percent, the

---

[11] *Shopoff & Cavallo LLP v. Hyon, supra*, A111396.

court awarded respondents the full shares they claimed from the residue of the Recovery, along with costs advanced and attorney fees.

Motions for attorney fees were subsequently filed and considered by the trial court. After a hearing, the court awarded respondents costs and attorney fees as the prevailing parties (Civ. Code, § 1717) in their actions against Hyon; Hyon was found not to be the prevailing party in any of the various actions and was denied an award of costs or attorney fees. The court filed an amended order that approved the receiver's final report, terminated the receivership, discharged the receiver, and distributed the Recovery assets on September 12, 2007.[12] Hyon has appealed from orders in the interpleader action and the order awarding attorney fees.

In June of 2007, the Second District Court of Appeal issued its opinion in *Hyon, supra,* 152 Cal.App.4th 463, in which it agreed with the trial court's conclusion that Selten's 1997 Agreement with Hyon and Colangelo "was illegal in part and that the illegal portions cannot be severed" from the remainder of the agreement, but further concluded "that Selten should nonetheless be permitted to pursue his common count for the reasonable value of any lawful services rendered." (*Id.* at p. 465.) The LA Action was remanded, with Selten granted the opportunity to pursue his "common count for reasonable value" of "services he lawfully provided," and Hyon "free to pursue" the claim that Selten engaged "in the unauthorized practice of law" and for that reason was not entitled to any recovery.[13] (152 Cal.App.4th 463, 473.)

## DISCUSSION

### I. *Hyon's Waiver of the Right to Appeal.*

As a threshold matter we first confront respondents' claim that Hyon waived the right to pursue the present appeal by his voluntary acceptance of the benefits of the judgment in the form of distribution of his adjudicated share of the proceeds of the Recovery. Respondents rely on the "settled rule that the voluntary acceptance of the benefits of a judgment will bar appeal therefrom . . . ." (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 744 [131 Cal.Rptr. 873, 552 P.2d 1169], citing *Gudelj v. Gudelj* (1953) 41 Cal.2d 202, 214 [259 P.2d 656] and *Schubert v. Reich* (1950) 36 Cal.2d 298, 299 [223 P.2d 242].) They claim that Hyon "has obtained substantial benefits from the judgment, and cannot now be heard to appeal those portions of the judgment with which he disagrees."

---

[12] The trial court did not dissolve the partnership of Hyon and Colangelo.

[13] Like the trial court in the present case, the appellate opinion in *Hyon* did not reach the issue of unauthorized practice of law. (*Hyon, supra,* 152 Cal.App.4th 463, 473.)

However, "The 'rule that voluntary acceptance of the benefits of a judgment bars appeal therefrom is subject to qualifications.' [Citation.] The party relying on a waiver theory 'must demonstrate a "clear and unmistakable acquiescence in" the judgment, an "unconditional, voluntary, and absolute" acceptance of the fruits thereof.' [Citations.]" (*Kacha v. Allstate Ins. Co.* (2006) 140 Cal.App.4th 1023, 1037 [45 Cal.Rptr.3d 92].) "Furthermore, where the benefits accepted are those to which the appellant would be entitled even in the event of reversal, acceptance thereof does not bar prosecution of the appeal. [Citations.] Thus, '[i]f the appeal is only from a portion of a judgment in which the issues are severable, the portions from which no appeal is taken may become final and beyond the scope of review of the appellate court [citations]; and so where the judgment clearly establishes the appellant's right to recover but the amount is less than he demands, he may accept it and nevertheless appeal, claiming the larger recovery. [Citations.]' [Citation.]" (*In re Marriage of Fonstein, supra,* 17 Cal.3d 738, 744.)

Hyon has accepted distribution of a portion of the proceeds of the Recovery to which he is entitled under the trial court judgment, but claims in this appeal that the trial court erred by failing to reduce the share awarded to respondents and commensurately increase the judgment awarded to him. We conclude that Hyon has preserved his appeal rights by consistently pursuing his objections to the trial court's rulings (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 86 [16 Cal.Rptr.2d 575]), and has not acquiesced in the judgment below or waived his right to appeal. (*In re Marriage of Fonstein, supra,* 17 Cal.3d 738, 744–745; *Kacha v. Allstate Ins. Co., supra,* 140 Cal.App.4th 1023, 1037; *Phillips v. Isham* (1951) 105 Cal.App.2d 608, 611 [233 P.2d 637].)

## II. *The Rulings on Shopoff's Demurrers to Hyon's Cross-complaint.*

Addressing the merits of the appeal, we first turn to Hyon's argument that the trial court erred by sustaining Shopoff's demurrers to his first and second amended cross-complaints in the interpleader action. Shopoff's demurrer to the first amended cross-complaint was sustained by the court on June 22, 2005, without leave to amend as to the conversion and abuse of process causes of action and with leave to amend as to the causes of action for legal malpractice, breach of fiduciary duty, constructive fraud and accounting. Hyon filed a second amended cross-complaint on June 29, 2005.[14] Shopoff responded with a general and special demurrer. After a hearing, the court sustained the demurrer with leave to amend the cause of action for legal malpractice and the part of the breach of fiduciary action that alleged misappropriation of the Recovery assets, and without leave to amend as to the

---

[14] The second amended cross-complaint was filed after the court appointed a receiver in the interpleader action on June 13, 2005.

remaining associated causes of action. Hyon did not amend the second amended cross-complaint, but rather filed a motion for reconsideration, along with a proposed third amended cross-complaint, which was denied for failure to assert new and different facts as required by Code of Civil Procedure section 1008. Hyon now claims that he properly alleged causes of action for conversion, legal malpractice and breach of fiduciary duty, and his pleading was erroneously dismissed.

"Our task in reviewing a judgment sustaining a demurrer is to determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] We assume the truth of the properly pleaded material facts and the reasonable inferences that may be drawn therefrom. [Citation.] We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1083 [32 Cal.Rptr.3d 483, 116 P.3d 1162].)

A. *The Conversion Cause of Action.*

Hyon maintains that he alleged the essential elements of a conversion action, which " 'are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages. It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use. [Citations.]' [Citation.] Money can be the subject of an action for conversion if a specific sum capable of identification is involved." (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 451–452 [61 Cal.Rptr.2d 707].) Hyon asserts that he was entitled to ownership of the Recovery proceeds, and at least a portion of it—particularly the shares of common stock of Mega Sand and Taiki Corporation—was converted by Shopoff's failure to transfer or return it to him and Colangelo upon request. He also alleged in the cross-complaint that additional conversion occurred as a result of losses he incurred "by being unable to take the corporate actions necessary to operate the Decker Island Business as a going concern."

We have no quarrel with the premise espoused by Hyon that *some* of the Recovery assets, including the stock in the Decker Island business, may be the proper subject of a conversion action. (See *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 123–126 [55 Cal.Rptr.3d

621].)[15] Where Hyon's conversion cause of action patently founders, however, is in the failure to assert the essential elements that Shopoff exercised dominion over the Recovery proceeds and converted them to his own use. Shopoff, as trustee of the Recovery proceeds, retained and interpled the funds precisely to avoid potential liability for conversion. If he had disbursed the funds to an improper party—whether that was Hyon or anyone else—with knowledge that another claimant had lawful contractual rights to the proceeds, an action for conversion against him may have been appropriate. (See *Farmers Ins. Exchange v. Smith* (1999) 71 Cal.App.4th 660, 666–667 [83 Cal.Rptr.2d 911]; *Fischer v. Machado* (1996) 50 Cal.App.4th 1069, 1073 [58 Cal.Rptr.2d 213]; *McCafferty v. Gilbank* (1967) 249 Cal.App.2d 569, 577 [57 Cal.Rptr. 695]; *Miller v. Rau* (1963) 216 Cal.App.2d 68, 76 [30 Cal.Rptr. 612].) Instead, when presented with competing claims, Shopoff properly held the funds, then filed the interpleader action, and thereby avoided the risk of liability to the person lawfully entitled to the Recovery proceeds if it turned out that the person to whom the distribution was made was not rightfully entitled to the funds. (See *Kaiser Foundation Health Plan, Inc. v. Aguiluz* (1996) 47 Cal.App.4th 302, 305–306 [54 Cal.Rptr.2d 665].)

■ Shopoff as a mere custodian, intermediary or conduit, who interpled the Recovery proceeds when faced with conflicting claims, did not exercise dominion over the funds sufficient to convert them to his own use in denial of Hyon's rights. (See *Simonian v. Patterson* (1994) 27 Cal.App.4th 773, 781–782 [32 Cal.Rptr.2d 722].) A party who interpleads funds cannot " 'be held accountable in tort because it declined to resolve [a] problem and instead tendered the funds into court' " for resolution of competing claims to funds it held. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 874 [6 Cal.Rptr.2d 151], italics omitted, citing *Pacific Loan Management Corp. v. Superior Court* (1987) 196 Cal.App.3d 1485, 1492 [242 Cal.Rptr. 547].) As a matter of law Hyon's cross-complaint did not state a cause of action for conversion against Shopoff, and we are convinced that there is no reasonable possibility an amendment can cure the glaring defect in the pleading. The trial court did not err by sustaining the demurrer to the conversion cause of action without leave to amend. (*Simonian, supra,* at p. 782.)

B. *The Legal Malpractice and Breach of Fiduciary Duty Causes of Action.*

■ We proceed to the legal malpractice and breach of fiduciary duty causes of action, which we examine together, as both are based on Shopoff's status and associated duties as counsel for Hyon. " 'Actionable legal malpractice is compounded of the same basic elements as other kinds of actionable

---

[15] In contrast, the alleged losses that resulted from Hyon's inability to operate the business are property rights that are too indefinite, intangible and uncertain to state a claim for conversion. (*Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 792 [131 Cal.Rptr.2d 347].)

negligence: duty, breach of duty, causation, and damage. The elements of a cause of action for professional negligence are: (1) the duty of the professional to use such skill, prudence and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence.' [Citation.]" (*Loube v. Loube* (1998) 64 Cal.App.4th 421, 429 [74 Cal.Rptr.2d 906].) ■ "To establish a cause of action for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship, breach of that duty and damages." (*Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182 [51 Cal.Rptr.3d 471].)

■ The trial court found that Hyon's allegations of proximately caused damages were either inadequate, uncertain or speculative, and we agree. "If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort." (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433].) ■ "To show damages proximately caused by the breach, the plaintiff must allege facts establishing that, 'but for the alleged malpractice, it is more likely than not the plaintiff would have obtained a more favorable result.' [Citations.]" (*Charnay v. Cobert, supra*, 145 Cal.App.4th 170, 179, italics omitted.) "Unless a party suffers damage, i.e., appreciable and actual harm, as a consequence of his attorney's negligence, he cannot establish a cause of action for malpractice. Breach of duty causing only speculative harm is insufficient to create such a cause of action. [Citation.] '[D]amages may not be based upon sheer speculation or surmise, and the mere possibility or even probability that damage will result from wrongful conduct does not render it actionable. [Citation.]' [Citation.]" (*Thompson v. Halvonik* (1995) 36 Cal.App.4th 657, 661–662 [43 Cal.Rptr.2d 142].) Also, "Allegations of damages without allegations of fact to support them are but conclusions of law, which are not admitted by demurrer." (*Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 12 [101 Cal.Rptr. 499].) On demurrer, the court does not " 'assume the truth of contentions, deductions or conclusions of law.' [Citation.]" (*Soliz v. Williams* (1999) 74 Cal.App.4th 577, 584 [88 Cal.Rptr.2d 184].)

Hyon's legal malpractice and breach of fiduciary duty causes of action, although infused with a multitude of complicated and in some instances confusing or even inconsistent allegations, are based on several essential theories of proximately caused damages. The first is that without Shopoff's breach of duty—consisting of improperly inducing Hyon to agree to the GSA by representing that he would thereafter operate the Decker Island business, but not disclosing the liens granted to Shopoff and the other claimants that effectively prevented that result—Hyon would not have approved the settlement, and ultimately would have obtained a more beneficial result in the Decker Island litigation by enforcing the $7.6 million judgment so as to own

the business and assets "free and clear," without the personal obligation to pay the defendants $2.6 million. Hyon also alleged that Shopoff provided him with inadequate advice associated with the approval of the GSA that diminished the value of the Recovery: (1) by failing to clarify the status of the deed of trust which secured the $2.6 million indebtedness owed by Hyon and Colangelo to the defendants and gave them a "first position security interest in Decker Island," and with it the right to foreclose on the Decker Island business in the event the indebtedness is not paid; (2) by failing to investigate, consider, or advise Hyon of "substantial potential tax issues" associated with the GSA that "would have substantially lessened the tax burden now facing" him; (3) by failing to discover a $100,000 debt owed by the companies whose stock was included in the Recovery proceeds; and (4) by forcing Hyon to incur a $100,000 personal debt to continue operation of the Decker Island business and thereby preserve the Recovery assets due to his inability to operate the business without the threat of foreclosure by lienholders.

■ Hyon's theories of recovery for legal malpractice in the cross-complaint suffer from a critical infirmity: they pled speculative damages that might occur in the future, but had not yet occurred. Our high court has repeatedly stressed, " 'The mere breach of a professional duty, causing only *nominal damages, speculative harm, or the threat of future harm—not yet realized*—does not suffice to create a cause of action for negligence. . . .' [Citation.]" (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 749–750 [76 Cal.Rptr.2d 749, 958 P.2d 1062], italics added; see also *Budd v. Nixen, supra,* 6 Cal.3d 195, 200; *Fritz v. Ehrmann* (2006) 136 Cal.App.4th 1374, 1381 [39 Cal.Rptr.3d 670]; *Jackson v. Johnson* (1992) 5 Cal.App.4th 1350, 1355 [7 Cal.Rptr.2d 482].) " 'Hence, until the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice.' [Citation.]" (*International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 614 [38 Cal.Rptr.2d 150, 888 P.2d 1279]; see also *Sahadi v. Scheaffer* (2007) 155 Cal.App.4th 704, 715 [66 Cal.Rptr.3d 517]; *Sindell v. Gibson, Dunn & Crutcher* (1997) 54 Cal.App.4th 1457, 1466 [63 Cal.Rptr.2d 594].) Uncertainty as to the fact of damage negatives the existence of a cause of action. (*Roger E. Smith, Inc. v. SHN Consulting Engineers & Geologists, Inc.* (2001) 89 Cal.App.4th 638, 651 [107 Cal.Rptr.2d 424], citing *Walker v. Pacific Indemnity Co.* (1960) 183 Cal.App.2d 513, 517 [6 Cal.Rptr. 924].)

All of Hyon's asserted claims of proximately caused damages are predicated on the fact that the ultimate liquidation and distribution of the Recovery proceeds would result in less compensation to him than he would have realized if he had eschewed the GSA and proceeded to collect the entire $7.6 million judgment in the Decker Island litigation. But when the pleadings and demurrers were filed, the Recovery proceeds had been interpled and remained in the control of a court-appointed receiver. Until liquidation, the value of the

stock and other tangible and intangible property awarded to Hyon and Colangelo in the GSA was unknown—and could possibly exceed even the most optimistic recovery by Hyon under the terms of the Decker Island litigation judgment. Any damages Hyon claimed from Shopoff's alleged legal malpractice were contingent upon the amount of the eventual liquidation of the Recovery proceeds. The damages he asserted from the subordinate security interest on the deed of trust and the attendant potential for foreclosure were also contingent upon his default on the $2.6 million debt to the Decker Island litigation defendants, which had not yet happened. Further, no tax liability had been imposed upon Hyon and he was not alleged to be liable finally and directly for the $100,000 debt owed by the Decker Island business entities whose stock was awarded to him and Colangelo in the GSA. Even Hyon's $100,000 personal debt for expenses to operate the Decker Island business was to be repaid with the Recovery proceeds and may not result in damages to him. In short, all of the harm alleged by Hyon was potential and speculative, dependent on the outcome of the liquidation of the Recovery proceeds.[16]

█ As we read the operative pleading, the fact of any actual loss remained contingent rather than actual. (See *Adams v. Paul* (1995) 11 Cal.4th 583, 590 [46 Cal.Rptr.2d 594, 904 P.2d 1205]; *Horne v. Peckham* (1979) 97 Cal.App.3d 404, 417 [158 Cal.Rptr. 714]; *Fazio v. Hayhurst* (1966) 247 Cal.App.2d 200, 203 [55 Cal.Rptr. 370].) "[I]f the propriety of an attorney's advice is contingent on the outcome of a claim by or against the client, the client does not sustain actual injury until the claim is resolved adversely, which indicates both that the attorney erred and that the error caused harm." (*Van Dyke v. Dunker & Aced* (1996) 46 Cal.App.4th 446, 453 [53 Cal.Rptr.2d 862]; see also *Baltins v. James* (1995) 36 Cal.App.4th 1193, 1203 [42 Cal.Rptr.2d 896].) Actual injury occurs only "when the client finally suffers a detriment, which is not merely potential or tentative, as a direct result of the malpractice . . . ." (*Tchorbadjian v. Western Home Ins. Co.* (1995) 39 Cal.App.4th 1211, 1223 [46 Cal.Rptr.2d 370].) Even the "mere probability" that a certain event would have happened will not furnish the foundation for malpractice damages. " ' "Damages to be subject to a proper award must be such as follows the act complained of as a legal certainty." ' [Citations.]" (*Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1461–1462 [1 Cal.Rptr.3d 175], italics omitted.)

---

[16] The fact that the liquidation and distribution subsequently occurred is of no consequence to the trial court's ruling on the demurrer. "We review the correctness of the trial court's ruling at the time it was made, . . . not by reference to evidence produced at a later date." (*People v. Welch* (1999) 20 Cal.4th 701, 739 [85 Cal.Rptr.2d 203, 976 P.2d 754]; see also *People v. Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669]; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 336 [68 Cal.Rptr.2d 61].)

The trial court recognized that Hyon "may be able to state damages," particularly associated with the $2.6 million debt he incurred in the GSA, and thus granted him the opportunity to file a "new amended cross-complaint" to plead "other damages which are not speculative," but an amended pleading was never properly filed. Nor did Hyon demonstrate that an amendment would cure the defect in his cross-complaint. (*Ortega v. Contra Costa Community College Dist.* (2007) 156 Cal.App.4th 1073, 1080 [67 Cal.Rptr.3d 832]; *Ford v. Pacific Gas & Electric Co.* (1997) 60 Cal.App.4th 696, 705 [70 Cal.Rptr.2d 359].) We are left with a pleading that did not state causes of action for legal malpractice or breach of fiduciary duty. The trial court did not err by sustaining Shopoff's demurrer to Hyon's cross-complaint.

III. *The Right of Hyon to a Jury Trial in the Interpleader Action.*

Hyon also argues that he was improperly denied the right to a jury trial on the interpleader action. He maintains each respondent presented essentially a "contract claim for an interest in the Recovery" proceeds, which entailed a legal issue for resolution by a jury, despite his own assertion of an "unclean hands defense" to the action and the "incidental" application of equitable principles to the distribution of the interpleaded funds. From this premise Hyon complains that by removing the "legal issues from the hands of the jury" the trial court deprived him of "his constitutional right to a jury trial."

"In *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8 [151 Cal.Rptr. 323, 587 P.2d 1136], our Supreme Court stated: 'The right to a jury trial is guaranteed by our Constitution. (Cal. Const., art. I, § 16.) We have long acknowledged that the right so guaranteed, however, is the right as it existed at common law in 1850, when the Constitution was first adopted, "and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact." [Citations.] As a general proposition, "[T]he jury trial is a matter of right in a civil action at law, but not in equity." [Citations.]' Thus, at common law, the right to a jury trial existed for actions at law only, and there was no right to jury in an equitable action." (*People v. Bhakta* (2008) 162 Cal.App.4th 973, 978 [76 Cal.Rptr.3d 421].) Code of Civil Procedure section 592 also specifically "provides in full: 'In actions for the recovery of specific, real, or personal property, with or without damages, or for money claimed as due upon contract, or as damages for breach of contract, or for injuries, an issue of fact must be tried by a jury, unless a jury trial is waived, or a reference is ordered, as provided in this Code. Where in these cases there are issues both of law and fact, the issue of law must be first disposed of. In other cases, issues of fact must be tried by the Court, subject to its power to order any such issue to be tried by a jury, or to be referred to a referee, as provided in this Code.' "

(*Corder v. Corder* (2007) 41 Cal.4th 644, 656 [61 Cal.Rptr.3d 660, 161 P.3d 172]; see also *Kim v. Yi* (2006) 139 Cal.App.4th 543, 549 [42 Cal.Rptr.3d 841].)

■ We recently discussed the essential precepts that govern the right to a jury trial in civil actions: " 'If the action is essentially one in equity and the relief sought depends upon the application of equitable doctrines, the parties are not entitled to a jury trial.' [Citations.] [¶] ' " ' "If the action has to deal with ordinary common-law rights cognizable in courts of law, it is to that extent an action at law. In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law." ' [Citation.] On the other hand, if the action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial." [Citation.]' [Citations.]" (*DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 178–179 [62 Cal.Rptr.3d 722].) We realize that an action is not classified as equitable merely because "it requires the application of equitable principles"; the " 'fact that equitable principles are applied in the action does not necessarily identify the resultant relief as equitable. [Citations.] Equitable principles are a guide to courts of law as well as of equity. [Citations.]' [Citations.]" (*Jogani v. Superior Court* (2008) 165 Cal.App.4th 901, 909 [81 Cal.Rptr.3d 503].) Rather, "references to the 'gist' of the action" are an expression of "the rule that '[i]n classifying a given action as legal or equitable, the court looks to its substance, viz., the nature of the rights at issue and the remedy sought. . . .' [Citations.]" (*Id.* at p. 908.)

■ The gist of an interpleader action is not the subject of any dispute in the law. "[I]nterpleader is an equitable proceeding in which the rights of the parties, as between themselves, are governed by principles of equity." (*Williams v. Gilmore* (1942) 51 Cal.App.2d 684, 689 [125 P.2d 539]; see also *Virtanen v. O'Connell* (2006) 140 Cal.App.4th 688, 698 [44 Cal.Rptr.3d 702]; *Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 42–43 [12 Cal.Rptr.3d 711]; *City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1126 [84 Cal.Rptr.2d 361]; *State Farm Life Ins. Co. v. Pearce* (1991) 234 Cal.App.3d 1685, 1690 [286 Cal.Rptr. 267].) "The purpose of interpleader is to prevent a multiplicity of suits and double vexation. [Citation.] 'The right to the remedy by interpleader is founded, however, not on the consideration that a [person] may be subjected to double liability, but on the fact that he is threatened with double vexation in respect to one liability.' [Citation.]" (*City of Morgan Hill, supra,* at p. 1122.) "In an interpleader action, *the court initially* determines the right of the plaintiff to interplead the funds; if that right is sustained, an interlocutory decree is entered which requires the defendants to interplead and litigate their claims to the funds." (*Dial 800, supra,* at pp. 42–43, italics

added.) Then, in the second phase of an interpleader proceeding, the trial court also has "the power under [Code of Civil Procedure] section 386 to adjudicate the issues raised by the interpleader action including: the alleged existence of conflicting claims regarding the interpleaded funds; plaintiffs' alleged position as a disinterested mere stakeholder; and ultimately the disposition of the interpleaded funds after deducting plaintiffs' attorney fees." (*Id.* at p. 43.)

■ The California Supreme Court long ago established the principle " 'that a suit in interpleader, such as this one, and involving like issues, is an equitable proceeding in which the rights of the parties as between themselves are governed by principles of equity [citations], and . . . in such cases *the right to a trial by jury does not exist. . . .*' [Citations.]" (*Union Mutual Life Ins. Co. v. Broderick* (1925) 196 Cal. 497, 502 [238 P. 1034], italics added.) Even if the underlying controversy was one of law, the gravamen of an interpleader action between rival claimants to the proceeds is "of an equitable nature," and denial of an application for a jury trial is not error. (*Pomeroy v. Collins* (1926) 198 Cal. 46, 70–71 [243 P. 657].)

Recently in *Corder v. Corder, supra,* 41 Cal.4th 644, 653–654, our high court acknowledged that in an action to apportion the proceeds of an award of pecuniary damages among heirs following settlement of the underlying wrongful death suit, "the general equitable nature of apportionment proceedings" precludes a jury trial, even if the court takes additional evidence regarding the competing interests in the proceeds. The court further concluded that Code of Civil Procedure section 592, which grants the right to a jury trial for issues of fact in "actions for the recovery of specific, real, or personal property, with or without damages, or for money claimed as due upon contract, or as damages for breach of contract, or for injuries," "provides no independent basis for a right to a jury in the apportionment of wrongful death settlement proceeds." (*Corder, supra,* at p. 656.) "[P]roceedings to apportion a settlement fund among heirs are not actions 'for injuries' within section 592's contemplation, because they typically involve no allegation of injury infliction or wrongdoing by one heir against other heirs." (*Id.* at pp. 656–657, citing *Kim v. Yi, supra,* 139 Cal.App.4th 543, 549.) "Furthermore," the court added, "to the extent [plaintiff] assumes a *separate interpleader action* or a separate quiet title action *would afford the right to a jury,* [plaintiff] is wrong. (*Union Mutual Life Ins. Co. v. Broderick*[, *supra,*] 196 Cal. 497, 502 . . . [interpleader]; *Thomson v. Thomson* (1936) 7 Cal.2d 671, 681 [62 P.2d 358] [quiet title action when possession of the property not involved]; see *Estate of Phelps* (1990) 223 Cal.App.3d 332, 340 [273 Cal.Rptr. 2] [quiet title].)" (*Corder,* at p. 656, italics added.)

Similarly, the apportionment of the Recovery proceeds from the settlement of the underlying Decker Island litigation among competing claimants in the

interpleader action before us is an equitable proceeding that does not bring with it the right to a jury trial. The legal remedy of the total amount of damages to be awarded to the parties was conclusively decided in the GSA. Hyon's legal claims against Shopoff had been resolved by the trial court's prior rulings that sustained demurrers to the amended cross-complaints. For purposes of the right to a jury trial, the primary remaining issue in the interpleader action was apportionment, and the fact that the equitable issue of apportionment was dependent partially upon resolution of contractual issues of law " 'does not change that.' " (*Corder v. Corder, supra,* 41 Cal.4th 644, 657, quoting *Kim v. Yi, supra,* 139 Cal.App.4th 543, 549; see also *Williams v. Gilmore, supra,* 51 Cal.App.2d 684, 689.)

Further, this is not a case in which the sole claim was to enforce the legal remedy of quantum meruit recovery for the reasonable value of services provided. (See *Jogani v. Superior Court, supra,* 165 Cal.App.4th 901, 910.) The possible quantum meruit claims were decidedly peripheral and alternative to the substance and nature of the rights at issue, and were ultimately never reached by the court. Even Hyon's claims that the underlying retainer agreements of respondents were unenforceable did not depend upon resolution of legal contractual issues, but instead on essentially equitable considerations related to the effect of the illegality of the contracts upon the parties' rights to recover. (See *Chiba v. Greenwald* (2007) 156 Cal.App.4th 71, 81 [67 Cal.Rptr.3d 86]; *Yoo v. Robi* (2005) 126 Cal.App.4th 1089, 1104–1105 [24 Cal.Rptr.3d 740].) Although tangential legal issues may have remained for adjudication, the gist of the interpleader action was equitable. (*Pomeroy v. Collins, supra,* 198 Cal. 46, 71.) We conclude that the trial court did not err by denying Hyon the right to a jury trial. (*Union Mutual Life Ins. Co. v. Broderick, supra,* 196 Cal. 497, 502.)

IV. *Section 6155.*

Next, we confront Hyon's argument that neither Selten nor any of those attorneys who "received illegal referrals from" him may be awarded any portion of the Recovery proceeds. Hyon maintains that Selten violated section 6155 by providing "unlawful attorney referral services," and thus cannot recover under his unenforceable contingent fee agreement. He points out that the Second District Court of Appeal so concluded in the recent opinion in *Hyon, supra,* 152 Cal.App.4th 463, 465, and that that final determination is binding in this action under collateral estoppel principles. He adds that section 6155 also provides that "no attorney shall accept" an unlawful referral of potential clients, so the retainer agreements of those respondents "who accepted referrals from Selten are unenforceable." Hyon therefore requests that we reverse the contingent fee shares awarded to the attorneys who "accepted illegal referrals from Selten," and strike the "awards of contractual attorney's fees" to them.

## A. *The Collateral Estoppel Effect of the Ruling in* Hyon *upon Selten.*

As Selten acknowledges, the opinion in *Hyon, supra,* 152 Cal.App.4th 463, 468, determined "that he or NLN did recruit counsel for Hyon and Colangelo, because otherwise he would not be entitled to anything under the contract. [¶] Because the contract called for NLN to 'operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys,' it violated section 6155. Nor do the parties dispute that NLN did so operate, pursuant to the contract." The court in *Hyon* further concluded: "The contract is therefore illegal, at least in part. And because the contract provided for only a single consideration (the contingent fee) in exchange for all of NLN's services, including attorney referrals, the illegal portions of the contract cannot be severed. (Civ. Code, § 1608.) The trial court thus correctly concluded that the contract is illegal and unenforceable in its entirety."[17] (*Ibid.*) Nevertheless, the *Hyon* opinion found that the trial court "erred when it concluded that the illegality of the 1997 contract barred Selten's claim for the reasonable value of the lawful services he (or NLN) provided. Selten cannot recover for the reasonable value of his unlawful attorney referral services, his unauthorized practice of law (if any), or other unlawful conduct (if any). But he may recover the reasonable value of the lawful work he performed." (*Id.* at p. 472.)

██ Selten, Hyon and this court are bound by the pronouncements made in the *Hyon* opinion. "[T]he fundamental principles that govern the doctrine of collateral estoppel [are]: 'Issue preclusion by collateral estoppel "prevents 'relitigation of issues argued and decided in prior proceedings.' [Citation.]" [Citations.] The doctrine "rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent. . . ." [Citations.]' [Citation.]" (*Mooney v. Caspari* (2006) 138 Cal.App.4th 704, 717 [41 Cal.Rptr.3d 728].) " ' " 'Traditionally, collateral estoppel has been found to bar relitigation of an issue decided at a previous proceeding "if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding]." . . .' [Citations.]" [Citations.] "In addition to these factors, . . . the courts consider whether the party against

---

[17] These conclusions in the *Hyon* opinion were, of course, in direct conflict with the trial court's finding in the present case: "In short, I do not find that Selten operated a lawyer referral service, or if he did, that it had any impact on Hyon; there was certainly no adverse impact; quite the opposite. 'Eric [Selten] is the catalyst who had led us to winning the lawsuits.' These are the words of Hyon, as of August 2003."

whom the earlier decision is asserted had a 'full and fair' opportunity to litigate the issue." [Citation.]' [Citation.]" (*Ibid.*)

The final and definitive decision in *Hyon* that Selten cannot recover on his illegal and unenforceable 1997 Agreement is identical to the issue presented here. The opinion in *Hyon* became final, so it must be given collateral estoppel effect. (See *Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 89 [38 Cal.Rptr.3d 528]; *Golden Cheese Co. v. Voss* (1991) 230 Cal.App.3d 727, 736 [281 Cal.Rptr. 602]; *Brake v. Beech Aircraft Corp.* (1986) 184 Cal.App.3d 930, 941–942 [229 Cal.Rptr. 336].) Not only is the issue here identical, but Selten was a party to the *Hyon* action. We must therefore follow the *Hyon* opinion to conclude in this action that respondent Selten's contingent fee arrangement with Hyon and Colangelo is illegal in its entirety, and therefore he is not entitled to the specified 12 percent share of the Recovery proceeds as awarded by the trial court.

Selten nevertheless seeks to save a portion of his contingent fee by claiming that Colangelo has not disputed "Selten's rights to the 5% contingency fee" he owes under the 1997 Agreement—that is, half of the total 10 percent fee owed conjointly by Colangelo and Hyon—so Hyon has "the right to challenge 5% of the contingency fee, not the entire 10%." Selten also submits that the 2 percent increase in his contingent fee from 10 to 12 percent as agreed to by Hyon and Colangelo in 1999 was "separate and distinct" from the 1997 Agreement, and hence not tainted by the illegality. He further claims that the 2004 settlement agreement of the parties, by which he was expressly given a share (ultimately 2.1 percent) of the trial court's reduction of the fee paid to the Ervin, Cohen & Jessup law firm from 10 percent to 3 percent, is also separate and cannot be taken from him by the *Hyon* opinion. The straightforward response to Selten's claim is that the *Hyon* opinion found Selten's contingent fee "contract illegal and unenforceable in its entirety." (*Hyon, supra*, 152 Cal.App.4th 463, 473.) The fact that Colangelo may be willing to honor his contractual obligation to Selten does not render the 1997 Agreement valid in part, nor does it grant Selten the right to recover any portion of his contingent fee. The 2 percentage point increase in Selten's contingent fee in 1999, and the right granted to him to share in the diminution of the Ervin, Cohen & Jessup award, are also based on the illegal 1997 Agreement, and as the court in *Hyon* indicated, "cannot be severed." (*Id.* at p. 471.)

Under the binding authority of *Hyon*, we are compelled to decide that Selten cannot recover any part of his contingent fee share of the proceeds of the Recovery. We must also conclude, however, that appellant Hyon is equally bound by the determination that Selten may be entitled to recover the

reasonable value of the lawful work he performed—that is, other than unlawful attorney referral services or any unauthorized practice of law—as determined on remand.[18]

B. *The Collateral Estoppel Effect of the Ruling in* Hyon *on the Other Respondents.*

 The other respondents in the present case are not bound by any adjudication of the issues in *Hyon*. None were parties to the LA Action, nor were any of them in privity with Selten. "Without a strict identity of parties, collateral estoppel must be based upon the concept of privity. 'Collateral estoppel applies not only to parties to an action or proceeding, but also to those in privity with the parties.' [Citation.] Privity ' "refers 'to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights [citations] and, more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is "sufficiently close" so as to justify application of the doctrine of collateral estoppel. [Citations.]' [Citations.] ' "This requirement of identity of parties or privity is a requirement of due process of law." [Citation.] . . .' [Citations.]" [Citations.]" (*Mooney v. Caspari, supra*, 138 Cal.App.4th 704, 718.) Only Selten was a party to the LA Action, and he did not represent the interests of the other respondents. There is nothing in the record before us to suggest that the other respondents participated in the LA Action by gathering information or assisting any party in that litigation. (Cf. *Mooney, supra*, at p. 720.)

Moreover, the opinion in *Hyon* did not address or resolve the issue of the effect of Selten's illegal referral contract upon the right of the other retained attorneys to recover their percentage shares of the Recovery proceeds pursuant to their separate contingent fee agreements. The court in the *Hyon* case, not having any parties but Hyon, Colangelo and Selten before it, did not adjudicate the issue of illegal acceptance of referrals by respondents. The *Hyon* opinion also did not make any findings that attorneys other than Disner were even recruited by Selten to act as counsel for Hyon and Colangelo in violation of section 6155.[19] Thus, with the sole exception of Selten, the *Hyon* opinion does not preclude respondents, Disner included, from recovering pursuant to their contingent fee agreements with Hyon and Colangelo.

---

[18] We have not been alerted to any finding on that issue as of yet in the LA Action. We observe that the trial court's findings before us recite a litany of services Selten performed that do not fall within the scope of unlawful referral services. The trial court in the present case found that Selten did not engage in the unauthorized practice of law, and since Hyon has not challenged that finding on appeal, it is binding on remand under law of the case principles.

[19] The opinion stated: "Selten does not dispute that NLN referred Hyon and Colangelo to Disner and arranged for Disner to represent them in the Decker Island litigation. Had NLN not

C. *The Acceptance of Referrals by Respondents.*

We turn to the merits of Hyon's claim that respondents accepted illegal referrals from Selten in violation of section 6155, which not only proscribes any business that operates "for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys," but also provides that "no attorney shall accept a referral of such potential clients," unless the enumerated requirements of the statute are met.[20] This issue was presented to the trial court in the present case by Hyon, but was not explicitly resolved due to the court's finding that Selten did not operate an illegal referral service.[21] Hyon now complains that under section 6155, just as Selten's agreement is unenforceable, "the retainer agreements entered into by the attorneys who accepted referrals from Selten are unenforceable because such attorneys would not [have earned] their fees without the illegal conduct (accepting the illegal referral). Nor, for the same reasons, can the trial court's award of attorney's fees based on those contracts stand."

First, nothing in the pronouncement in *Hyon* that Selten operated an illegal referral service consequentially establishes *acceptance* of an illegal referral on the part of any of the attorneys. Operating an illegal referral service and accepting an illegal referral are separate violations and separate issues under section 6155. The *Hyon* opinion thus has no collateral estoppel effect in this proceeding on our resolution of the issue of whether respondents

---

done so, NLN would not be entitled to any compensation under the 1997 contract. NLN thus referred Hyon and Colangelo to Disner for a fee, in violation of section 6155." (*Hyon, supra,* 152 Cal.App.4th 463, 469–470.)

[20] Section 6155, subdivisions (a) and (b), read in full: "(a) An individual, partnership, corporation, association, or any other entity shall not operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys, and no attorney shall accept a referral of such potential clients, unless all of the following requirements are met:

"(1) The service is registered with the State Bar of California and (a) on July 1, 1988, is operated in conformity with minimum standards for a lawyer referral service established by the State Bar, or (b) upon approval by the Supreme Court of minimum standards for a lawyer referral service, is operated in conformity with those standards.

"(2) The combined charges to the potential client by the referral service and the attorney to whom the potential client is referred do not exceed the total cost that the client would normally pay if no referral service were involved.

"(b) A referral service shall not be owned or operated, in whole or in part, directly or indirectly, by those lawyers to whom, individually or collectively, more than 20 percent of referrals are made. For purposes of this subdivision, a referral service that is owned or operated by a bar association, as defined in the minimum standards, shall be deemed to be owned or operated by its governing committee so long as the governing committee is constituted and functions in the manner prescribed by the minimum standards."

[21] Hyon asserts that the trial court committed error by failing to resolve the issue of acceptance of illegal referrals. Implicit in the court's finding that Selten did not operate an illegal referral service is a finding that none of the attorneys accepted an illegal referral from him. No error was committed.

violated section 6155 by accepting illegal referrals of potential clients from Selten. (*Noble v. Draper* (2008) 160 Cal.App.4th 1, 17 [73 Cal.Rptr.3d 3].) "For a prior adjudication to give rise to issue preclusion, it must appear that the identical issue was actually litigated and necessarily decided in a prior proceeding." (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 582 [66 Cal.Rptr.3d 1], italics omitted.) "Unless the issue or cause of action in the two actions is identical, the first judgment does not stand as a bar to the second suit. [Citations.] ' "If 'anything is left to conjecture as to what was necessarily involved and decided' there can be no collateral estoppel [citations] . . . . '[I]t must appear . . . that the precise question was raised and determined in the former suit. . . .' " [Citation.]' [Citation.]" (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 181–182 [98 Cal.Rptr.2d 44].) We must examine individually the circumstances of the various retainer agreements of the attorneys to determine if an acceptance of an illegal referral occurred.[22]

 Upon doing so we do not find substantial evidence in the record to establish that any of the respondents accepted an illegal referral. First, Pine was retained long before Selten was involved in the case at all. Once Selten was hired, we know from the evidence and findings that he recruited at least Disner, and Disner then separately recruited Kirk and Bien to work on the Decker Island litigation for Hyon and Colangelo. Selten's recruitment of Disner's services does not establish an illegal acceptance of referrals by Bien and Kirk for purposes of section 6155. Bien and Kirk accepted referrals from Disner, not Selten. Selten's operation of an illegal referral service does not taint the agreements of Bien and Kirk obtained through the efforts of Disner, and nothing in the record indicates to us that Disner conducted a referral service that failed to comply with section 6155.

The evidence also demonstrates that Shopoff did not accept a referral from Selten. Rather, he was initially contacted by Bien through another attorney named "bob wallach." Hyon then proposed the contingent fee agreement for Shopoff to act as counsel in the Decker Island litigation. At most, Selten assisted Hyon by contacting Shopoff periodically during the discussion process, but his tangential participation did not include referral services. Shopoff did not accept an illegal referral.

 Even Disner, who, according to the decision in *Hyon*, was directly engaged by Selten, did not, as we view the evidence in the record before us, *accept* an illegal referral within the meaning of section 6155. We have

---

[22] Hyon submits that we must remand the case to the trial court for adjudication of this issue. Evidence pertinent to the issue was presented to the trial court, however, and is before us in the record on appeal. We therefore can and will resolve the question of illegal acceptance of referrals in this appeal.

acknowledged the binding determination in the *Hyon* opinion that Selten operated an illegal referral service by obtaining Disner's services as counsel for Hyon and Colangelo. We also realize that Disner must have therefore at least agreed to accept an offer from Selten to represent Hyon and Colangelo as clients in the Decker Island litigation. We find nothing in the *Hyon* opinion, however, that establishes a violation of section 6155 by Disner. The fact that Selten acted illegally by operating a referral service in contravention of section 6155 does not in itself mean that the referral must have also been accepted illegally by Disner within the meaning of the statute. An attorney does not accept an illegal referral pursuant to section 6155 merely because he or she was retained by someone who was operating an illegal referral service. As we interpret section 6155, acceptance of an illegal referral by an attorney must be with knowledge of at least the nature of the referral business that violates the statute—that is, a business that operates "for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys." (*Id.*, subd. (a).) Otherwise, attorneys who have accepted employment in good faith and without any awareness of an association with an illegal operation would fall within the proscription of the statute just by agreeing to represent clients. We are persuaded that the Legislature did not intend to punish those who have no knowledge of or complicity in the illegality.

Nothing in the record indicates that Disner had any knowledge of the nature of Selten's business operation or his agreement with Hyon and Colangelo. As the trial court observed, Selten assisted with retaining Disner pursuant to his agreement with Hyon and Colangelo, but to do so he did not choose Disner from a panel of lawyers to whom he routinely or even sporadically referred business. Instead, Selten located suitable counsel for his clients by referring to general lists of attorneys. Hyon failed to present any evidence that Disner was aware of a referral service, legal or illegal, being operated by Selten, or even that Selten was performing attorney referral services that fell within the provisions of section 6155. Disner was certainly aware that Selten contacted him to act as counsel for Hyon and Colangelo, but, as far as the record tells us, nothing more. Disner also did not compensate Selten in any way for his efforts. As the *Hyon* opinion pointed out, section 6155 does not make the "commonplace *uncompensated* attorney referrals" illegal. (*Hyon, supra*, 152 Cal.App.4th 463, 471.) Nor do we interpret the statute to make an uncompensated *acceptance* of a referral illegal, particularly where the evidence fails to show the attorney was aware an unlawful referral service was in operation. (*Ibid.*) We therefore conclude that the retainer agreements of respondents other than Selten do not violate section 6155.

## V. *Rule 3-300.*

Hyon also complains that respondents violated rule 3-300 by acquiring attorney's liens on the Recovery proceeds in their retainer agreements without complying with the disclosure and consent requirements specified in the rule.[23] He argues that the retainer agreements "create a charging lien in violation of rule 3-300," so neither the liens they create nor the percentage contingent fees "can or should be enforced by this court." He maintains that respondents are limited to "quantum meruit recovery for the reasonable value of services rendered," to be determined by a jury on remand.

Rule 3-300 prohibits attorneys from acquiring interests adverse to those of their clients unless specified requirements are satisfied. (*Frye v. Tenderloin Housing Clinic, Inc.* (2006) 38 Cal.4th 23, 52 [40 Cal.Rptr.3d 221, 129 P.3d 408].) In *Fletcher v. Davis* (2004) 33 Cal.4th 61, 69 [14 Cal.Rptr.3d 58, 90 P.3d 1216] (*Fletcher*), the California Supreme Court determined that an attorney's charging lien is "an adverse interest within the meaning of rule 3-300." "[A] charging lien grants the attorney considerable authority to detain all or part of the client's recovery whenever a dispute arises over the lien's existence or its scope. That would unquestionably be detrimental to the client." (*Ibid.*) Thus, "When an attorney wishes to secure payment of *hourly legal fees and costs* of litigation by obtaining a charging lien against a client's future recovery," (*id.* at p. 64, italics added) under rule 3-300 the attorney must "explain the transaction fully, to offer fair and reasonable terms, to provide a copy of the agreement, to give the client an opportunity to seek independent legal advice, and to secure the client's written consent." (*Fletcher*, at p. 71; see also *Fergus v. Songer* (2007) 150 Cal.App.4th 552, 570, fn. 6 [59 Cal.Rptr.3d 273].) If the attorney fails to comply with the rule, the "*lien may not be enforced*" in a proceeding to enforce a charging lien. (*Fletcher, supra*, at pp. 71–72, italics added.)

The *Fletcher* opinion expressly declined to decide the precise issue presented here, "whether rule 3-300 applies to a contingency-fee arrangement coupled with a lien on the client's prospective recovery in the same proceeding." (*Fletcher, supra*, 33 Cal.4th 61, 70, fn. 3.) The court noted an opinion of

---

[23] Rule 3-300 provides: "A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

"(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and

"(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

"(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition."

the Los Angeles County Bar Association, however, that suggested "rule 3-300 did not apply to a contingency fee coupled with a lien against the client's prospective recovery 'in the same matter in which legal services are being provided.' (3 Cal. Compendium on Prof. Responsibility, L.A. County Bar Assn. Formal Opn. No. 496 (Nov. 16, 1998) p. 238.)" (*Ibid.*, italics omitted.) But even if we were to find that the rule announced in *Fletcher* extends to liens attached to contingent fee agreements, only the *liens* asserted by respondents would be unenforceable. (*Id.* at pp. 71–72.) *Fletcher* did not state that noncompliance with rule 3-300 invalidates an underlying fee agreement or precludes an attorney from recovering a specified contractual fee.

■ We are also persuaded that granting recovery under a contingent fee agreement although the charging lien may be invalid is consistent with the law of severability of contracts. "[T]he need to void contracts in violation of the law must be tempered by the countervailing public interest in preventing a contracting party from using the doctrine to create an unfair windfall." (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 347 [17 Cal.Rptr.3d 66].) To implement the fundamental rule of law that forfeiture is disfavored, the law of severability of contracts provides in Civil Code section 1599 that, " 'Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest.' [Citation.] By its terms, it applies even—indeed, only—when the parties have contracted, in part, for something illegal. Notwithstanding any such illegality, it preserves and enforces any lawful portion of a parties' contract that feasibly may be severed." (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 991 [70 Cal.Rptr.3d 727, 174 P.3d 741].)

■ " ' "The overarching inquiry is whether ' "the interests of justice . . . would be furthered" ' by severance. [Citation.] . . ." [Citation.] . . .' [Citation.]" (*Templeton Development Corp. v. Superior Court* (2006) 144 Cal.App.4th 1073, 1084 [51 Cal.Rptr.3d 19].) " 'Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.' [Citations.]" (*Marathon Entertainment, Inc. v. Blasi, supra*, 42 Cal.4th 974, 996.) Two reasons to sever illegal terms rather than void the entire contract are (1) to "conserve a contractual relationship [without] condoning an illegal scheme,"

and (2) "prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement—particularly when there has been full or partial performance of the contract." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 124, 123–124 [99 Cal.Rptr.2d 745, 6 P.3d 669].) " ' " 'When the transaction is of such a nature that the good part of the consideration can be separated from that which is bad, the Courts will make the distinction, for the . . . law . . . [divides] according to common reason; and having made that void that is against law, lets the rest stand. . . .' " ' [Citation.] If the court is unable to distinguish between the lawful and unlawful parts of the agreement, 'the illegality taints the entire contract, and the entire transaction is illegal and unenforceable.' [Citation.]" (*Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 138 [70 Cal.Rptr.2d 304, 949 P.2d 1] (*Birbrower*); see also *Dunkin v. Boskey, supra,* 82 Cal.App.4th 171, 196.)

Here, the charging liens may only contravene provisions of rule 3-300 by creating interests adverse to the client without proper disclosure and consent; the contingent fee agreements are neither illegal nor infringe public policy considerations. (See *Calvert v. Stoner* (1948) 33 Cal.2d 97, 103 [199 P.2d 297]; *Pangborn Plumbing Corp. v. Carruthers & Skiffington* (2002) 97 Cal.App.4th 1039, 1053–1055 [119 Cal.Rptr.2d 416]; *Brienza v. Tepper* (1995) 35 Cal.App.4th 1839, 1849–1850 [42 Cal.Rptr.2d 690].) The object of the contingent fee agreements—that is, to compensate respondents with specified percentages of the Recovery proceeds—remains entirely lawful. The sole illegality, if any, arises, instead, from the provision of a charging lien without the required disclosures. Any violations of rule 3-300 may prevent respondents from enforcing the liens, but those violations do not taint or preclude recovery under the valid contingent fee agreements. (*Birbrower, supra,* 17 Cal.4th 119, 139; *Calvert v. Stoner, supra,* at pp. 102–103.)[24] Thus, in this

---

[24] In *Birbrower,* the Supreme Court invalidated only that portion of an attorney fee agreement relating to services that a New York law firm had provided in violation of California's attorney licensing statute. Because of the possibility that, under the doctrine of severability of contracts, the firm might be able to recover the fees it had lawfully earned by providing services in New York, the court reversed a summary adjudication order that had invalidated the entire attorney fee agreement. (*Birbrower, supra,* 17 Cal.4th 119, 138–139.) The court in *Birbrower* explained the result with the axiom we have mentioned: " ' " 'When the transaction is of such a nature that the good part of the consideration can be separated from that which is bad, the Courts will make the distinction, for the . . . law . . . [divides] according to common reason; and having made that void that is against law, lets the rest stand . . . .' " ' [Citation.]" (*Id.* at p. 138.)

In *Calvert v. Stoner, supra,* 33 Cal.2d 97, 103, an attorney fee provision in a retainer agreement was enforced where an illegal provision prohibiting a client from settling the case was found severable.

interpleader action, the awards of percentage shares in the Recovery to respondents, which were based on their respective contingent fee agreements, are not subject to reversal under rule 3-300.[25]

## VI. *The Awards of Attorney Fees.*

Appellant makes the additional argument, in cursory fashion, that the awards of attorney fees to respondents must be vacated "because all such contracts were void" as violative of section 6155 and rule 3-300. Since we have found that Selten's contingent fee agreement with appellant is unenforceable in its entirety under the compulsion of the collateral estoppel doctrine, the award of attorney fees to him under that contract must also be reversed. Selten has no other basis for recovery of his attorney fees as a stakeholder in the present interpleader action. (See *Pacific Gas & Elec. Co. v. Nakano* (1939) 12 Cal.2d 711, 715 [87 P.2d 700].) The remaining contingent fee agreements are valid and enforceable as we have explained above, and therefore the trial court did not err by awarding attorney fees to the remaining respondents as the prevailing parties in the case.

## REQUEST FOR SANCTIONS

Respondents Shopoff & Cavallo LLP, Jeffrey W. Shopoff and Jeffrey W. Shopoff, as trustee, have filed a motion for sanctions on the ground that the appeal is frivolous. We deferred consideration of the motion. After our review of the extensive briefing, the voluminous record that this case has generated and the arguments of the parties, we decline to impose any sanctions.

## DISPOSITION

The judgment in favor of respondent Selten is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion to determine the amount of compensation due Selten. The award of attorney fees to Selten is also reversed. In all other respects the judgment in favor of respondents and the awards of attorney fees to respondents, other than Selten, are affirmed.

---

[25] We emphasize that we make no finding that any of the provisions granting charging liens in the individual contingent fee agreements of respondents failed to comply with rule 3-300. For some of the agreements, the evidence seems to indicate otherwise. We merely conclude that even if we assume a violation of the rule, the underlying contracts are not for that reason invalid, nor are the judgments in favor of respondents erroneous.

Hyon and Selten shall each bear their own costs on appeal. All other respondents are awarded their costs on appeal from Hyon.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied November 24, 2008, and appellant's petition for review by the Supreme Court was denied January 14, 2009, S168948. George, C. J., did not participate therein.